[Cite as *State v. Sanders*, 2022-Ohio-1806.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                       CASE NO. 1-21-47

    v.

JOHN E. SANDERS,                             O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR 2019 0471

**Judgment Affirmed**

Date of Decision:  May 31, 2022

APPEARANCES:

    *William T. Cramer* for Appellant

    *Jana E. Emerick* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, John E. Sanders ("Sanders"), brings this appeal from the September 21, 2021, judgment of the Allen County Common Pleas Court sentencing him to an aggregate, indefinite prison term of 12-15 years after Sanders was convicted in a jury trial of felonious assault with a firearm specification and kidnapping with a firearm specification. On appeal, Sanders argues that his convictions were against the manifest weight of the evidence, that the trial court improperly limited cross-examination of a witness, and that the Reagan Tokes Law is unconstitutional.

*Background*

{¶2} On September 22, 2019, Sanders got into an argument with his live-in girlfriend, D.B., at the couples' residence on Collett Street in Lima. The argument escalated as the couple moved between rooms in the residence. At one point, D.B. followed Sanders into the kitchen where Sanders had a rifle, a 9mm pistol, and bullets on the table. After seeing the weapons, D.B. told Sanders that he would go to prison if he killed her, and Sanders responded that he would not, because he was going to do a "murder/suicide."

{¶3} When D.B. went back to the bedroom, Sanders followed her, bringing the 9mm handgun. Sanders then put the gun to D.B.'s temple and told her to open

her mouth. Sanders put the gun in D.B.'s mouth and told her, *inter alia*, not to move, and to beg for her life.

{¶4} Shortly thereafter, Sanders told D.B. to go outside and get into her truck, adding that he would be out in a moment. D.B. complied and when Sanders came outside he had D.B.'s cell phone and a small red bag with a handgun in it. Sanders told D.B. to go to the park to collect herself, then go to her mother's residence. Sanders then went back inside.

{¶5} Before D.B. left, she realized that she did not have her medication so she went back to the residence. The door to the residence was locked and Sanders told her to go away. When D.B. did not immediately leave the porch, Sanders fired two bullets through the door. D.B. went to the neighbor's residence and 9-1-1 was called. Police responded but Sanders fled the area in D.B.'s truck before officers arrived. Sanders was located several days later.

{¶6} On December 12, 2019, Sanders was indicted for felonious assault in violation of R.C. 2903.11(A)(2), a second degree felony, and kidnapping in violation of R.C. 2905.01(A)(3), a first degree felony. Both charges carried three-year firearm specifications pursuant to R.C. 2941.145(A). Sanders pled not guilty to the charges.

{¶7} The matter proceeded to a jury trial on July 6-7, 2021.[1] The State presented the testimony of D.B., D.B.'s neighbor, and the law enforcement officers who investigated the matter. Numerous photographs were introduced into evidence including photographs of the bullet holes in the door. Further, the 9-1-1 call and body camera footage from one of the officers who responded to the scene were entered into evidence.

{¶8} Sanders cross-examined witnesses and also testified on his own behalf. He largely acknowledged incidents as testified to by D.B.; however, he claimed that before he shot through the door he had looked through the peephole and purposely fired "warning shots" that would not strike D.B. He also maintained that he let D.B. go "unharmed." While admitting that he made serious mistakes, Sanders contended that the charges did not fit his actions.

{¶9} After the case was submitted to the jury, Sanders was convicted of both charges and the accompanying specifications.

{¶10} On September 21, 2021, the matter proceeded to a sentencing hearing. Sanders was sentenced to serve an indefinite prison term of six to nine years on the felonious assault, an indefinite prison term of six to nine years on the kidnapping,

---

[1] Prior to trial, Sanders dismissed his retained attorney and elected to represent himself even though he was offered appointed counsel and stand-by counsel. The trial court held a hearing wherein it was explained to Sanders what representing himself would entail. Despite the trial court's explanation, and the offers for appointed counsel, or at least stand-by counsel, Sanders signed a written waiver of counsel and acknowledged that he was representing himself with a full understanding of the matter. As Sanders's self-representation has not been raised as an issue on appeal, we will not further address it.

and three-year mandatory prison terms on both of the firearm specifications. The felonious assault and the kidnapping prison terms were ordered to be served concurrently; however, the prison terms for the firearm specifications were ordered to be served consecutive to each other, and consecutive to the concurrent prison term for felonious assault/kidnapping.

{¶11} A judgment entry memorializing Sanders's sentence was filed September 21, 2021. It is from this judgment that Sanders appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The weight of the evidence does not support the guilty verdict on felonious assault.**

**Assignment of Error No. 2**
**The weight of the evidence does not support the jury's finding that the victim was not released in [a] safe place unharmed in regard to the kidnapping count.**

**Assignment of Error No. 3**
**Appellant's confrontation rights under the federal and state constitutions were violated when the trial court imposed erroneous limitations on cross-examination.**

**Assignment of Error No. 4**
**Indefinite prison terms imposed under the Reagan Tokes Law violate the jury trial guarantee, the doctrine of separation of powers, and due process principles under the federal and state constitutions.**

{¶12} Because both the first and second assignments of error deal with a discussion of the evidence, we will address them together.

Case No. 1-21-47

*First and Second Assignments of Error*

**{¶13}** In his first assignment of error, Sanders argues that his conviction for felonious assault is against the manifest weight of the evidence. In his second assignment of error, Sanders argues that his conviction for kidnapping was against the manifest weight of the evidence.

Standard of Review

**{¶14}** In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*.

**{¶15}** Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State*

-6-

Case No. 1-21-47

*v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*,

131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

Controlling Statutes

**{¶16}** In this case Sanders was convicted of felonious assault in violation of

R.C. 2903.11(A)(2), which reads as follows:

> **(A)  No person shall knowingly \* \* \***
>
> **\* \* \***
>
> **(2)  Cause or attempt to cause physical harm to another \* \* \* by means of a deadly weapon or dangerous ordnance.**

**{¶17}** Sanders was also convicted of kidnapping in violation of R.C.

2905.01(A)(3), which reads as follows:

> **(A)  No person, by force, threat, or deception, \* \* \* shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:**
>
> **\* \* \***
>
> **(3)  To terrorize, or to inflict serious physical harm on the victim or another[.]**

**{¶18}** Both charges carried firearm specifications pursuant to R.C.

2941.145(A), which required the jury to determine that

> **the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense.**

-7-

Evidence Presented

**{¶19}** Sanders and D.B. met online in September of 2017. In early February of 2018 they began a romantic relationship and by April of 2018 they lived together. Both Sanders and D.B. dealt with mental health issues—Sanders due, at least in part, to his prior military service. D.B. dealt with depression, anxiety, and bipolar disorder.[2]

**{¶20}** On September 22, 2019, Sanders and D.B. were planning to go to a family reunion. Just after noon, Sanders and D.B. got into an argument. The argument escalated, moving between rooms, and at one point when D.B. followed Sanders into the kitchen, Sanders had a rifle, a 9mm pistol, and bullets placed on the table. There was also a bow and arrow on the ground. D.B. indicated she did not even know that Sanders had firearms in the residence.

**{¶21}** D.B. commented, "You know if you kill me you're going to prison." (Tr. at 211). According to D.B., Sanders responded, "No, I'm not. I'm going to do a murder/suicide." (*Id.*)

**{¶22}** D.B. testified that Sanders held a "billy club" and he smacked it against the kitchen table. D.B. then left the kitchen and went to the bedroom, but Sanders followed her, bringing the 9mm handgun. Sanders then put the gun to D.B.'s temple and told her to open her mouth. Sanders put the gun in D.B.'s mouth

---

[2] D.B. testified that at the time of the incident she was recovering from knee surgery so she was taking as many as seventeen different pills each day.

and told her to beg for her life. She said she could not move because D.B. had the gun in her mouth.

{¶23} D.B. testified that in the moments that followed,

**I was crying a lot. He stood up next to the dresser. I don't know. He didn't point the gun at me. I don't know if he had it in his hand. Well, obviously he had it in his hand. I don't know if he had his finger on the trigger. But, I was crying a lot. He told me to, "Shut up; don't cry; don't move; don't word nothing to me with your mouth. I don't want to hear you. I don't want to see you. I don't want to hear you. Don't talk." I'm trying not to, but – "Don't cry." I'm trying not to, but it was hard. Then he tells me to pick up my keys and go out to the truck and he'd be out there in a minute. So, that's what I did.**

(Tr. at 214).

{¶24} D.B. went outside and got into her truck, but she did not have her cell phone. Sanders subsequently came outside holding D.B.'s phone and a red cloth bag that had the handgun inside it. Sanders told D.B. to go to Faurot Park, collect herself, and then drive to her mother's house. Afterward, he went back inside the residence.

{¶25} Once Sanders went inside, D.B. remembered that she did not have her medication, so rather than leaving, she walked to the front door, opened the storm door, and knocked. The door was locked and D.B. asked Sanders to let her in to get her medication and she told him that she would then leave.

{¶26} As she banged on the door, D.B. heard Sanders behind the door "fiddling with something." (Tr. at 218). She knew there was a peephole in the door so she stepped to the side by the cooler, still holding the storm door open. Moments

later she heard a "pop" and she reacted by crouching. (*Id*. at 218). As she was getting up, she heard a "pop" again.

{¶27} It is undisputed that Sanders had fired two bullets through the door.

{¶28} After the shots were fired, D.B. went to her neighbor's residence. The neighbor described D.B. as "frantic," "scared," "shaky," and "all over the place." (Tr. at 147). D.B. told the neighbor what happened and the neighbor called the authorities even though D.B. did not want the police involved. Before police arrived at the scene, Sanders left the area in D.B.'s truck.

{¶29} Upon arrival, officers saw D.B. bent over on the sidewalk "hysterically crying," accompanied by her neighbor. (Tr. at 157). One officer indicated that due to D.B.'s hysteria he could not understand her when he asked if she had been shot or if anyone was inside the residence. After the responding officers learned what happened they cleared the residence and located the two bullet holes in the front door. They found and extracted one of the spent bullets, which was located in the top of the porch overhang.[3]

{¶30} Sanders was located several days after the incident, walking alongside a road and carrying a "rucksack." The rucksack contained, *inter alia*, a disassembled 9mm and three loaded magazines. One of the magazines was missing two bullets and the missing shell casings at the scene of the incident were consistent with those

---

[3] One of the officers mistakenly labeled the spent bullet as a 40 caliber bullet. A detective later testified that this was an easy mistake to make with a spent bullet.

in the magazine that was missing two bullets. The 9mm Sanders was carrying was reassembled and test-fired and found to be operational.

**{¶31}** Overall, D.B. described the incident as "traumatic," indicating that she "blocked a lot of [the event] out of [her] head." (Tr. at 230). The State introduced body camera footage into evidence from one of the responding officers so D.B.'s demeanor and mental state shortly after the event could be observed by the jury.

**{¶32}** Notably, D.B. acknowledged at the trial that she still loved Sanders and that she talked to him regularly.

**{¶33}** Sanders testified on his own behalf acknowledging that he made serious mistakes on the day in question and that he "lost control." (Tr. at 355). Sanders claimed that at the time he put the gun in D.B.'s mouth, it was unloaded. He also claimed that he told D.B. to beg for her life because he wanted her to live and he "needed her to convince [him]. [He] needed her to help [him] not hurt her." (*Id*. at 360). Sanders testified that he did not call the VA crisis hotline because he had called them before and it got police involved.

**{¶34}** Sanders testified that he realized he was in a dangerous place mentally and that he needed to be alone so he told D.B. to leave the residence. When D.B. came back to the front door after getting into the truck outside, Sanders testified that he begged D.B. to go away. He claimed that he looked through the peephole in the door, saw where D.B. was, and fired a "warning" shot high and into the rafters.

When she did not leave, he stated that he fired a second "warning" shot. Sanders claimed that he made certain that the rounds would not hit D.B. He emphasized that he let D.B. leave "unharmed."

{¶35} On rebuttal, the State recalled the detective who investigated the matter. He testified that he traced the trajectory of the bullets Sanders fired to approximately eight to ten feet away from the door. The shell casings from the fired rounds were found at approximately that distance, corroborating the trajectory.

{¶36} Moreover, the detective testified that there were no powder burns on the door indicating that the gun was not fired against the door or close to it, contrary to Sanders's testimony. Further, the detective testified that when firing through a structure, it was unpredictable how a bullet might change direction.

{¶37} Finally, Sanders and D.B. had a "trail cam" outside their residence that recorded their movements on the day in question. Sanders's movements and D.B.'s movements were consistent with D.B.'s story, including Sanders bringing out her phone to the truck while holding a red bag. However, the incident itself is not visible on the recording.

### Felonious Assault

{¶38} Sanders contends that his conviction for felonious assault was against the manifest weight of the evidence because the evidence did not support a finding that he was aware that his conduct would probably cause physical harm to D.B. or

that he attempted to cause harm but was unsuccessful. He claims that he admittedly threatened D.B. and fired two warning shots through the door, but there was nothing to establish that he was knowingly attempting to harm D.B., particularly given his testimony that he checked the peephole before firing.

**{¶39}** Contrary to his argument, Sanders admittedly and knowingly fired two shots at different spots in his front door while being aware that D.B. was behind that door. Generally, firing a gun in a person's direction is at least sufficient evidence of felonious assault.[4] *State v. Henderson*, 1st Dist. Hamilton No. C-130541, 2014-Ohio-3829, ¶ 27, citing *State v. Jordan*, 8th Dist. Cuyahoga No. 73364, 1998 WL 827588 (Nov. 25, 1998) (noting that "firing a gun in a person's direction is sufficient evidence of felonious assault"); *see also State v. Gregory*, 90 Ohio App.3d 124, 131 (11th Dist.1993) ("the shooting of a gun in a place where there is a risk of injury to one or more persons supports the inference that appellant acted knowingly").

**{¶40}** Moreover, in addition to Sanders's direct knowledge that D.B. was behind the door, and his actions in firing twice through that door in different spots, during the argument in the house, Sanders had threatened D.B. with a "murder/suicide." As the Supreme Court of Ohio has held, "'It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.'" *State v. Conway*, 108 Ohio St.3d 214, 2006-

---

[4] While we are dealing with manifest weight here rather than sufficiency, this body of law provides a starting point for our analysis.

Ohio-791, ¶ 143, quoting *State v. Johnson*, 56 Ohio St.2d 35, 39 (1978). Based on the above evidence cited alone it is not unreasonable for a jury to conclude beyond a reasonable doubt that Sanders was knowingly attempting to cause physical harm to D.B. with a firearm when he shot two bullets in her direction through a door after threatening her with death.

{¶41} Furthermore, Sanders's claims on appeal do not withstand closer scrutiny. Although Sanders claimed he was firing "warning" shots through the door to get D.B. to leave, he did not have to fire specifically *at* the door at all. In addition, if he was only firing a "warning" shot he certainly did not have to fire a *second* shot, and he did not have to fire in a different area of the door than he had the first time.

{¶42} Furthermore, while Sanders may claim that he looked through the peephole just before he shot in order to specifically avoid shooting D.B., the State presented evidence that contradicted this statement. The bullet trajectories established by the detective showed that the shots were fired roughly eight to ten feet from the door. Shell casings from the shots were located approximately that far from the door. Thus it would be reasonable for a jury to disbelieve Sanders's claim that he looked through the peephole just before he shot.[5]

---

[5] Nevertheless, even if he did look through the peephole at some point, by the time he had walked backward several steps to the point he shot from, D.B. could have moved, indicating he was not being as careful as he claimed. This further undermines his story.

**{¶43}** While it is true that one of the bullets fired by Sanders went over D.B.'s head and was ultimately located in the porch overhang and the other bullet was higher on the other side of the door, the detective intimated that the bullet closest to D.B. was "only about five feet, five and a half feet off the ground, which would have struck her in about the face." (Tr. at 383). Regardless, the detective testified that when a bullet goes through a solid object like a door the trajectory can change and it was unknown where the bullet would wind up once it passed through.

**{¶44}** Given all of the evidence presented, we cannot find that the jury clearly lost its way or created a manifest miscarriage of justice by convicting Sanders of felonious assault with a firearm specification as indicted. Under other circumstances where a defendant shot in the direction of an individual through a door, a conviction for felonious assault has been upheld, and we can find no differently here. *See State v. Nurien,* 3d Dist. Union No, 14-21-18, 2022-Ohio-1711; *State v. Jordan*, 10th Dist. Franklin No. 04AP-827, 2005-Ohio-3790. For all of these reasons, Sanders's first assignment of error is overruled.

### Kidnapping

**{¶45}** Sanders's next assignment of error broadly claims that his kidnapping conviction was against the manifest weight of the evidence; however, he focuses his argument on the jury's determination that D.B. was not "released * * * in a safe

place unharmed," which, if proven by Sanders, would have reduced the kidnapping to a second degree felony.

{¶46} Importantly, in arguing that the jury should have determined that D.B. was released in a safe place unharmed, and that his first-degree felony kidnapping should be reduced to a second-degree felony, Sanders seems to be effectively acknowledging that a kidnapping occurred, then arguing that he had established the mitigating provision that D.B. was released in safe place and unharmed. However, to the extent that Sanders challenged the weight of the evidence as to whether a kidnapping occurred *at all*, D.B. clearly testified that Sanders held her at gun point, told her not to move, and made her beg for her life. She indicated that she was terrified, that the event was traumatic, showing that she was terrorized. Thus the conviction and the accompanying specification were not against the weight of the evidence.

{¶47} As to Sanders' claim that the jury lost its way by failing to find that D.B. was released in a safe place unharmed, the Supreme Court of Ohio has held that it is Sanders's burden to establish this affirmative defense to kidnapping. *State v. Sanders*, 92 Ohio St.3d 245, 265, 2001-Ohio-189. Thus Sanders had to establish by a preponderance of the evidence that D.B. was, *inter alia*, unharmed.

{¶48} The Supreme Court of Ohio has held that for the purposes of this kidnapping statute, harm can be either physical or psychological. *State v. Mohamed*,

151 Ohio St.3d 320, 2017-Ohio-7468, ¶ 14.  In this case the jury was presented with testimony that D.B. found the event traumatic. The jury was able to observe D.B. shortly after the incident via an officer's body cam footage.  Given the testimony and the jury's ability to see and hear D.B. both at trial and on the date of the incident, we cannot find that the jury clearly lost its way by determining that *Sanders* had not established that D.B. was "unharmed" as defined.  Therefore, Sanders's second assignment of error is overruled.

*Third Assignment of Error*

{¶49} In his third assignment of error, Sanders argues that the trial court violated his rights under the confrontation clause when it "imposed erroneous limitations on cross-examination" of one of the State's witnesses.

Analysis

{¶50} During the trial, Sanders routinely cross-examined the State's witnesses.  However, Sanders contends that when the State finished examining its final witness, the trial court improperly limited Sanders's cross-examination during the following dialogue.

> **DEFENDANT:  Your Honor, at this time are we only cross examining on the testimony that was just given, or on Detective Stechschulte entirely?**
>
> **THE COURT:  You cross examine him on what he's testified to on direct.**
>
> **DEFENDANT:  Just this morning?**

**THE COURT:  Yea.**

**DEFENDANT:  Understood, your Honor.**

(Tr. at 330).

{¶51} As we noted earlier, Sanders elected to represent himself at trial and he would sometimes ask the trial court questions regarding proper procedure.  He had not asked the trial court about the parameters of cross-examination with any of the State's prior witnesses, yet he did before he cross-examined the State's final witness.

{¶52} Based on the foregoing dialogue, Sanders contends that the trial court's response effectively limited him from examining the witness on other matters relevant to the case that may not have been discussed on direct examination. However, he acknowledges in his brief that he did not indicate what other topics he wished to address on cross-examination of the State's final witness.  Rather, he indicates that merely by raising the issue to the trial court he showed that he intended to go beyond the questions from the direct examination.

{¶53} By contrast, the State contends that the trial court was not attempting to specifically constrain Sanders's cross-examination but rather trying to convey to a pro se defendant that cross-examination should be limited to relevant issues. Further the State points out that there were only two sustained objections to any of the questions Sanders asked of the State's final witness on cross-examination. The

State argues that there simply is no showing of any line of questioning that Sanders was prevented from asking.

**{¶54}** While it is possible that the trial court effectively *meant* to convey to Sanders that he was limited to relevant matters and those affecting credibility pursuant to Evid.R. 611(B), the trial court did state that Sanders was limited to what was testified to on direct. Contrary to the trial court's plain wording, the law in Ohio is that "cross-examination is not limited to the subject matter of direct examination." *State v. Treesh*, 90 Ohio St.3d 460, 481, 2001-Ohio-4. Thus regardless of the trial court's intended meaning with its statement to Sanders, the actual wording the trial court expressed to Sanders was legally erroneous.

**{¶55}** However, in analyzing the impact of the trial court's erroneous legal ruling, we cannot find that the error was anything other than harmless. After reviewing the record, and Sanders's brief on appeal, Sanders does not establish any relevant questions that he was prevented from asking, and we are left to speculate that he was actually prevented from asking something, and that it would have been relevant to the case at hand. Generally, we cannot reverse a conviction on speculation such as this. *See State v. Moffett*, 9th Dist. Summit No. 28001, 2016-Ohio-5314, ¶ 11, citing *State v. Murawski,* 8th Dist. Cuyahoga No. 70854, 2002–Ohio–3631, ¶ 8 ("Arguing what * * * a witness might have testified requires a court to indulge in baseless speculation, which will not establish prejudice.").

**{¶56}** Moreover, because there is no showing as to what Sanders was even potentially prevented from asking, this case is different *State v. Rapp*, 4th Dist. Ross. No. 1544, 67 Ohio App.3d 33 (1990), wherein an assignment of error was sustained because cross-examination was erroneously limited on a specific line of questioning. Based on the record before us, we do not find that the error was anything other than harmless, particularly given that the evidence is largely undisputed that Sanders shot through a door multiple times that he was aware D.B. was behind. *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 15. For these reasons, Sanders's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶57}** In his fourth assignment of error, Sanders argues that the Reagan Tokes Law is unconstitutional, violating his right to Due Process, violating the Separation of Powers, and violating his right to a jury trial.

Standard of Review

**{¶58}** Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). An error qualifies as "plain error" only if it is obvious and but for the error, the outcome of the proceeding clearly would have been otherwise. *State v. Barnhart*, 3d Dist. Putnam No. 12-20-08, 2021-Ohio-2874, ¶ 8, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 245, 2002-Ohio-2126, ¶ 32.

*Analysis*

{¶59} Sanders did not challenge the constitutionality of the Reagan Tokes Law before the trial court. For this reason, we apply the plain error standard in this case. *Accord Barnhart* at ¶ 8; *State v. Crawford*, 3d Dist. Henry No. 7-20-05, 2021-Ohio-547, ¶ 10.

{¶60} Sanders's challenges do not present a matter of first impression in this Court. Since the indefinite sentencing provisions of the Reagan Tokes Law went into effect in March 2019, we have repeatedly been asked to address the constitutionality of these provisions. We have invariably concluded that the indefinite sentencing provisions of the Reagan Tokes Law do not facially violate the separation-of-powers doctrine or infringe on defendants' due process rights. *E.g.*, *State v. Crawford*, 3d Dist. Henry No. 7-20-05, 2021-Ohio-547, ¶ 10-11; *State v. Hacker*, 3d Dist. Logan No. 8-20-01, 2020-Ohio-5048, ¶ 22; *State v. Wolfe*, 3d Dist. Union No. 14-21-16, 2022-Ohio-96, ¶ 21.

{¶61} In this case, Sanders asks us to reconsider our earlier decisions. In recent months, a number of defendants have requested the same of us—requests that we have uniformly rejected. *E.g.*, *State v. Abston*, 3d Dist. Henry No. 7-21-04, 2022-Ohio-884, ¶ 33; *Wolfe* at ¶ 22; *Barnhart* at ¶ 12-15; *State v. Mitchell*, 3d Dist. Allen No. 1-21-02, 2021-Ohio-2802, ¶ 17; *State v. Rodriguez*, 3d Dist. Seneca No. 13-20-07, 2021-Ohio-2295, ¶ 15. As Sanders has not presented us with any

compelling reason to depart from our earlier precedent on facial challenges to Reagan Tokes, we once again decline to do so.

**{¶62}** Sanders also challenges Reagan Tokes as applied to him, contending that Reagan Tokes violates his constitutional right to a trial by jury. In the past, we have held that certain as applied challenges to Reagan Tokes were not ripe for review. *See*, *e.g.*, *State v. Kepling*, 3d Dist. Hancock No. 5-20-23, 2020-Ohio-6888, ¶ 11. However, the Supreme Court of Ohio recently decided *State v. Maddox*, --- Ohio St.3d ---, 2022-Ohio-764, and determined that constitutional challenges to Reagan Tokes are ripe for review. Based on the holding in *Maddox*, we will address the constitutional issues under Reagan Tokes related to a jury trial.

**{¶63}** In reviewing the matter, we emphasize that statutes are presumed constitutional, and it is Sanders's burden to demonstrate that the statute at issue is unconstitutional. *State v. Thompkins*, 75 Ohio St.3d 558, 1996-Ohio-264. Sanders has presented no compelling authority undermining the constitutionality of Reagan Tokes.

**{¶64}** Notwithstanding this point, numerous Ohio Appellate Courts have already rejected challenges similar to Sanders's. *State v. Rogers*, 12th Dist. Butler No. CA2021-02-010, 2021-Ohio-3282, ¶ 18; *State v. Thompson*, 2d Dist. Clark No. 2020-CA-60, 2021-Ohio-4027, ¶ 25; *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2022-Ohio-470, ¶ 46 (en banc). We agree with the reasoning expressed by

the other Ohio Appellate Courts cited herein and determine that Sanders's "as applied" challenge regarding the jury trial issue is unavailing.

{¶65} For all of these reasons, Sanders has not established plain error, and his fourth assignment of error is overruled.

*Conclusion*

{¶66} For the foregoing reasons, Sanders's assignments of error are overruled and the judgment and sentence of the Allen County Common Pleas Court is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and MILLER, J., concur.**

**/jlr**